UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IVETTE CLARKE,

                    Plaintiff,

        -v-

ANDREW M. SAUL, Commissioner of Social Security,

                    Defendant.

CIVIL ACTION NO.: 20 Civ. 2377 (LGS) (SLC)

**REPORT AND RECOMMENDATION**

**SARAH L. CAVE**, United States Magistrate Judge:

**TO THE HONORABLE LORNA G. SCHOFIELD**, United States District Judge:

## I.      INTRODUCTION

Plaintiff Ivette Clarke ("Ms. Clarke") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  She seeks review of the decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI") under the Act.  Ms. Clarke contends that the decision of the Administrative Law Judge dated October 31, 2018 (the "ALJ Decision") was erroneous, not supported by substantial evidence, and contrary to law, and asks the Court to remand for a new hearing to reconsider the evidence.

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  On January 5, 2021, Ms. Clarke filed a motion for judgment on the pleadings (ECF No. 22) ("Ms. Clarke's Motion"), and on March 8, 2021, the Commissioner cross-moved (ECF No. 23) (the "Commissioner's Motion").  For the reasons set forth below, I

respectfully recommend that Ms. Clarke's Motion (ECF No. 22) be GRANTED and the Commissioner's Motion (ECF No. 23) be DENIED.

## II.     BACKGROUND

### A.  Procedural History

On March 4, 2016, Ms. Clarke filed an application for SSI benefits,[1] alleging that she had been disabled since January 1, 2007.  (SSA Administrative Record ("R.") 19, 224 (ECF No. 18)).  On July 8, 2016, the SSA initially denied Ms. Clarke's application, and Ms. Clarke appeared for an evidentiary hearing before ALJ Dina R. Loewy on April 17, 2018 and July 19, 2018.  (R. 19, 34–89).

On October 31, 2018, ALJ Loewy issued the Decision finding that Ms. Clarke was not disabled under the Act.  (R. 19–28).  Although ALJ Loewy found that Ms. Clarke had six severe impairments—major depressive disorder, anxiety, hidradenitis suppurativa,[2] degenerative disc disease, osteoarthritis, and anemia—she concluded that the severity of these impairments did not meet or medically equal the requisite criteria for a finding of disability.  (R. 21–23 (citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926)).

---

[1] SSI requires a showing of financial need.  20 C.F.R. § 416.202.

[2] "Hidradenitis suppurativa is a chronic, recurrent inflammatory disease affecting skin that bears apocrine glands.  It is manifested as painful, deep-seated, inflamed lesions, including nodules, sinus tracts, and abscesses, and is estimated to affect 1% of the population. . . lesions treated with incision and drainage routinely recur."  Gregor B.E. Jemec, Hidradenitis Suppurativa, 366 NEW ENG. J. MED. 158, 159 (2012).  This condition mostly affects areas "where the skin rubs together, such as the armpits, groin, buttocks and breasts."  Hidradenitis suppurativa, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/hidradenitis-suppurativa/symptoms-causes/syc-20352306 (last visited May 25, 2021).

The severity of Hidradenitis suppurativa is classified according to the Hurley staging system, from stage I disease, which is "localized and includes the formation of single or multiple abscesses, without sinus tracts and scarring[,]" to stage III disease, "which includes diffuse or nearly diffuse involvement of the affected region, with multiple interconnected tracts and abscesses across the entire area."  Jemec, supra, at 160. Only about 1% of patients with Hidradenitis suppurativa are afflicted with stage III disease, which may require "extensive" surgery.  Id. at 160, 162.

On January 13, 2020, the SSA Appeals Council denied Ms. Clarke's request for review of ALJ Loewy's Decision. (R. 1–5). On March 18, 2020, Ms. Clarke filed the Complaint in this Court. (ECF No. 1). Ms. Clarke raises two arguments in her Motion: (1) that the ALJ failed at step three of the sequential evaluation process to properly evaluate her hidradenitis suppurativa, which, she contends, met the requirements of Listing § 8.06; and (2) that the ALJ neglected her duty to fully develop the record by obtaining medical treatment records and by failing to ask Ms. Clarke how her chronic skin conditions affect her. (ECF No. 22). The Commissioner argues that the ALJ's Decision was supported by substantial evidence and that the ALJ fulfilled her duty to develop the record. (ECF No. 24).

## B. Factual Background

### 1. Non-medical evidence

Ms. Clarke was born in 1964 and was 51 years old on March 4, 2016, the date she submitted her disability claim. (R. 224). Her education ended at the ninth grade. (R. 45, 251). Ms. Clarke has not worked for more than fourteen years; her employment history includes working as a home attendant from 2005–06 and working as a tax preparer at a bank from 1999–2000. (R. 250–52, 303). Ms. Clarke stopped working in 2006 "due to illness." (R. 399). She supports herself with $162 in monthly need-based assistance as well as Supplemental Nutrition Assistance Program ("SNAP") benefits. (R. 225–26).

Ms. Clarke's daughter Adriana Clarke[3] was appointed her caregiver in 2017, and assists her with insurance, medical treatment coverage and scheduling issues. (R. 46, 52–53, 56).

---

[3] Because Ms. Clarke and Adriana Clarke share the same last name, the Court will refer to Adriana Clarke as Adriana.

Adriana "do[es] everything" for Ms. Clarke, including bathing her, combing her hair, cooking for her and cleaning, because, she testified, Ms. Clarke would be unable to do these activities herself. (R. 69).

Ms. Clarke uses Lyft to travel to medical appointments as necessary. (R. 70).

## 2. Medical evidence

Ms. Clarke and the Commissioner have both provided summaries of the medical evidence in the record, which are largely consistent with one another. See ECF Nos. 22 at 6–12; 24 at 6–13. Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete and summarizes the pertinent history of Ms. Clarke's hidradenitis suppurativa for purposes of the issues raised in this suit.

On February 27, 2015, Ms. Clarke, then living at the LIFE Program shelter, had an initial visit with Nurse Practitioner ("NP") Ifeoma Okpaleke. (R. 355). Although Ms. Clarke reported that she was in a generally good state of health, her skin had lumps and sores and her right axillary had multiple open lesions and was draining seroussanguinous fluid.[4] (R. 355, 357).

On May 13, 2015, Ms. Clarke, accompanied by Adriana, reported to NP Sarah Acker a "30[-]year history" of "multiple painful cystic, scaring lesions in [her] armpits, groin, and under [her] breast . . . that open and drain purulent, sometimes bloody fluid. [Ms. Clarke] reports quality of life significantly affected by condition with embarrassment and pain associated with

---

[4] Containing or consisting of both blood and serous fluid, a "clear to pale yellow watery fluid that is found in the body especially in the spaces between organs and the membranes which line or enclose them[.]" Serosanguineous, serous fluid, Merriam-Webster, merriam-webster.com/medical/serosanguineous, merriam-webster.com/dictionary/serous%20fluid (last visited May 25, 2021).

lesions." (R. 365). NP Acker documented "multiple cystic lesions" to the bilateral axilla,[5] "some draining large amounts of grey purulent fluid[,]" with rope-like scars and sinus tracts noted. (R. 365–66). NP Acker assessed Ms. Clarke's hidradenitis suppurativa as "severe, hurley stage III," a serious and rare form of the disease. (R. 367); see supra n.2. AP Acker prescribed Clindamycin Phosphate lotion and Mupirocin to prevent secondary infection, and referred Ms. Clarke to dermatology, with a note that surgery for apocrine gland removal could be warranted. (R. 367).

NPs Okpaleke and Acker continued to treat Ms. Clarke for her hidradenitis suppurativa. On May 28, 2015, Ms. Clarke reported to NP Okpaleke that she was continuing with the medications and was at the time able to do her usual activities. (R. 369). On October 1, 2015, Ms. Clarke followed up with NP Acker reporting problematic and continued purulent lesions in her armpits and groin, which were responsive to the Clindamycin Phosphate treatment. (R. 374). NP Acker refilled her medications, and documented that Ms. Clarke was "reluctant to get surgery while in [a] shelter." (R. 374, 376).

The following month, on November 3, 2015, Ms. Clarke reported to NP Acker difficulty performing her daily activities due to pain and requiring the assistance of her daughter. (R. 381). She again complained of continued purulent lesions to her armpits and groin, responsive to the Clindamycin Phosphate treatment. (Id.) NP Acker directed Ms. Clarke to use a cane as needed, and provided a note indicating that Ms. Clarke "cannot work due to multiple comorbidities. She requires the full-time assistance of her daughter due to lumbalgia, hidradenitis suppurativa (Hurley Stage III)" and other disorders (R. 382, 351).

---

[5] Axillae (axilla singular) are the spaces below the glenohumeral joint (the armpit), which contain "the axillary artery and vein, the infraclavicular part of the brachial plexus, axillary lymph nodes and vessels and areolar tissue." Axilla, Stedman's Medical Dictionary (Nov. 2014 ed.).

Ms. Clarke followed up with NP Acker on January 19, 2016 reporting pain at a 10/10 level, including to the low back and the hands and feet, and noted that she was still living in a shelter with her daughter, although she was seeking other housing. (R. 387). NP Acker documented that Ms. Clarke was unstable, used a cane and required assistance to stand, and noted that Ms. Clarke was taking Clindamycin Phosphate twice daily and Mupirocin daily, among other medications. (R. 387–88). A Treating Physician's Wellness Plan Report dated January 19, 2016 documented "chronic suppurativa lesions in [bilateral] axilla" and noted that it was poorly controlled, as well as "severe iron deficiency anemia." (R. 352–53). NP Acker opined that based on her examination of Ms. Clarke, a review of her chart and reports from specialists, Ms. Clarke was "[u]nable to work for at least 12 months." (R. 353).

Ms. Clarke's hidradenitis suppurativa required surgery and a more than two-week hospitalization, during which she spent time in the surgical intensive care unit ("SICU"). Ms. Clarke was admitted to Lincoln Medical Center on May 2, 2016 with purulent drainage from both axilla, below both breast creases, and her groin, including multiple "extremely tender" wounds in the perineum. (R. 461, 468). Ms. Clarke stated that "she has had multiple abscesses of the groin and axilla for 'years'" but had not followed up. (R. 471). She was deemed to be a poor historian. (Id.) Ms. Clarke was noted to be septic due to the extensive hidradenitis. (R. 468). On May 2, 2016, surgeons performed a wide debridement of the bilateral axilla and the bilateral perineal groin. (R. 461–63). Surgical notes indicate that Ms. Clarke was admitted "with extensive and recurrent hidradenitis" manifesting in indurations with ulcerations, cavitations and purulent draining or serosanguinaous discharge on both axilla, both inframammary folds, the bilateral labia major, and both lower limbs. (R. 465, 472–73). Ms. Clarke was admitted to the SICU with

persistent tachycardia and due to the risk of septicemia. (R. 453, 455). An attending note dated May 9, 2016, seven days after the surgery, noted that "[s]he has multiple infective wounds in the whole body. Is in almost continuous pain all over[]" and required a blood transfusion. (R. 437–38).

The discharge orders, dated May 19, 2016, noted that Ms. Clarke was stable and ambulating and directed a slow return to usual activities as tolerated, and directed follow up with the plastic surgery clinic. (R. 394). Surgeon Stephen Stampp[6] provided Ms. Clarke a note stating

> Ms. Clarke has been under my surgical care . . . I am familiar with her social situation and even more so with her medical condition . . . [Ms. Clarke's] medical issues and the concern for infection control are paramount. She requires <u>separate</u> personal space from that of her family members to ensure her own healing and to prevent co-infection of the inhabitants in her home.

(R. 392) (emphasis in original).

The medical records include further episodes of hidradenitis suppurativa and medical treatment, less than three months later. On August 1, 2016, Ms. Clarke followed up with NP Acker, who observed multiple pustular lesions to the bilateral axilla. (R. 553–54). NP Acker refilled Ms. Clarke's Mupirocin ointment and directed that she begin using Bacitracin ointment. (R. 555). NP Acker also referred Ms. Clarke for dermatology and directed that she be evaluated for another surgery. (R. 555).

On August 25, 2016, and again on November 22, 2016, NP Acker examined Ms. Clarke and documented multiple pustular lesions to the bilateral axilla. (R. 557, 559–62). NP Acker started Ms. Clarke on lidocaine for pain associated with the hidradenitis suppurativa, and documented that she walked "with obvious pain" using a cane. (R. 559, 562).

---

[6] This name is handwritten and may be spelled differently.

Nine months later, on August 24, 2017, Ms. Clarke reported to NP Acker that her hidradenitis was unimproved and she was in pain. (R. 576). NP Acker documented that Ms. Clarke was using a cane. (R. 577).

A letter dated December 4, 2018 (following the ALJ's Decision) from Dr. Allison Kutner of the Montefiore Department of Dermatology noted that Ms. Clarke was receiving treatment for "moderate-to-severe hidradenitis suppurativa, which requires treatment with topical medication, [four] oral medications and an intravenous infusion on a regular basis." (R. 15).

### C. Administrative Proceedings

#### 1. Hearings before ALJ Loewy

On April 17, 2018, ALJ Loewy held a prehearing conference at which Ms. Clarke was accompanied by Adriana. (R. 75). ALJ Loewy inquired whether Ms. Clarke understood English and Adriana replied in the affirmative, but then qualified, "it's going to be hard – she understands English and Spanish. It's going to be hard and she's going to look at me and say what'd you say. She's not going to understand." (R. 78). Adriana later advised that Ms. Clarke would not require an interpreter. (R. 86).

ALJ Loewy informed Ms. Clarke that the SSA received her medical records through 2016, and Ms. Clarke authorized the SSA to obtain more recent medical records. (R. 80–81). Adriana informed ALJ Loewy that Ms. Clarke received primary care at Housing Works [a community healthcare provider] and was treated primarily—including for her dermatological illness—by NP Acker. (R. 81–83). Adriana stated that the only medical care Ms. Clarke received after 2016 was at Housing Works. (R. 85).

On July 19, 2018, ALJ Loewy held a video hearing. Ms. Clarke was assisted by a representative from the Human Resources Administration Disability Services Program and accompanied by Adriana. (R. 34–38). ALJ Loewy noted that the SSA received Lincoln Medical Center medical records from May 2016 as well as follow-up records from Housing Works, but noted a lack of physical examinations. (R. 39). According to ALJ Loewy, the records were deficient because "I see a Sarah, who's a nurse, treating her . . . I don't have a doctor or a specialist, a specialist in this condition who has been treating her or seeing her for me to rely on." (R. 56). ALJ Loewy described her understanding of Ms. Clarke's condition: "they [Ms. Clarke and Adriana] mainly go on emergency basis when the – an event of the hidradenitis occurs. So, they go, and they do the drainage and sometimes they keep the claimant." (R. 40).

ALJ Loewy focused at the hearing on whether Ms. Clarke received follow-up dermatological care at Montefiore for her hidradenitis suppurativa. Ms. Clarke testified that she did not have a referral or did not have an appointment scheduled. (R. 41–42). Following Ms. Clarke's testimony, Adriana testified that her mother did not receive follow up dermatological care at Montefiore because of an insurance coverage issue stemming from a change to Ms. Clarke's insurance provider, and also because there were instances where either Ms. Clarke was unable to walk or Adriana was ill and unable to bring her for treatment. (R. 51–52, 54–55). Adriana also explained that she and Ms. Clarke had been living in a shelter for much of the relevant time period and Ms. Clarke's caregiver "would just wait until we would get out [of the shelter] to refer us to places[.]" (R. 59–60).

Ms. Clarke testified that recently she has not been going to the emergency room for hidradenitis episodes because "it drain[s] by itself." (R. 44). In fact, Adriana testified "she got open wounds. Right now, she's draining right now . . ." (R. 57).

Ms. Clarke described that beginning one year earlier, that is, 2017, Adriana was appointed to be her caregiver through Medicaid. (R. 46). She testified that her daily activities are strictly limited, and she is unable to pick up items of any weight, and experiences "so much pain walking and picking up[]" as well as a problem in her back. (R. 45). Ms. Clarke also described pain in her joints, unexplained episodes of tachycardia, joint pain, and requiring blood transfusions "because I'm losing a lot of blood." (R. 47). Additionally, Ms. Clarke testified that she could only walk for approximately two blocks, after which she experiences fatigue and suffers panic attacks. (R. 48). The record reflects that Ms. Clarke had a cane at the hearing. (R. 70). Ms. Clarke testified that she limits her exposure to sunlight because "it start[s] itching and I start getting weak and blood start[s] coming down on my body." (R. 50). With respect to her psychological and emotional conditions, Ms. Clarke described depression following the death of her mother and experiencing domestic violence, and episodes of panic attacks and anxiety, particularly associated with public transportation. (R. 48–49).

Adriana's testimony expanded on Ms. Clarke's limitations and the effects of her conditions and answered questions concerning Ms. Clarke's failure to receive follow-up medical care, particularly from dermatological specialists. Adriana reported instances of Ms. Clarke fainting outside, and described that she does "every little thing" for Ms. Clarke, including bathing her, cooking, and cleaning, because Ms. Clarke cannot perform these tasks. (R. 59, 69).

Last, ALJ Loewy took testimony from Mary Vasishth, a vocational expert.  (R. 61).  ALJ Loewy asked the expert whether there were any jobs in the national economy for a hypothetical individual that could perform light work,[7] low stress jobs with only occasional decision-making, only occasional changes in the work setting, with an SVP level one or two, and that would permit the individual to ambulate to the work station using a cane.  (R. 62–63).  The expert testified that there were jobs available for such an individual, such as an office helper, mail clerk, and photocopying machine operator.  (R. 62–64).  Responding to a follow-up hypothetical, the expert testified that if the cane were required for balance, then the available jobs would be eliminated.  (R. 67).

ALJ Loewy kept the record open for four weeks to obtain additional medical records and noted that Ms. Clarke could schedule follow-up medical care which the SSA would consider.  (R. 60, 68).

## 2.    The ALJ Decision

On October 31, 2018, ALJ Loewy issued her Decision denying Ms. Clarke SSI benefits and holding that Ms. Clarke has not been under a disability since March 4, 2016, the date of her application.  (R. 28).

ALJ Loewy followed the five-step disability determination process.  At step one, ALJ Loewy found that Ms. Clarke had not engaged in substantial gainful activity since her application date.  (R. 21).  At step two, the ALJ found that Ms. Clarke had six severe impairments:  major depressive

---

[7] ALJ Loewy included the following exertional limitations for light work:  occasional push/pull, no foot controls, occasionally climbing ramps or a few stairs, rarely full flights, never climbing ladders, ropes, or scaffolds, occasionally balancing or stooping, never kneeling, crouching or crawling, and avoiding concentrated exposure to extreme temperatures, wetness and humidity.  (R. 62).

disorder, anxiety, hidradenitis suppurativa, degenerative disc disease, osteoarthritis, and anemia. (R. 21).[8]

At step three, the ALJ found that Ms. Clarke did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act. (R. 22–23). (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings"). With respect to Listing § 8.06 for Hidradenitis suppurativa, the Decision states the following:

> Listing 8.06 is not met by the claimant's hidradenitis suppurativa because there is no evidence of extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least [three] months despite continuing treatment as prescribed.

(R. 22). The ALJ also considered, and ruled out, Listings §§ 1.04 for disorder of the spine, 7.05 hemolytic anemia, 12.04 affective disorders, and 12.06 anxiety-related disorders. (R. 22–23 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1)).

ALJ Loewy assessed Ms. Clarke's residual functional capacity (her "RFC") as being able to perform light work[9] with various limitations, with an SVP level one or two, in low stress jobs with only occasional decision-making and changes in the work setting, and occasional interaction with the public, coworkers and supervisors. (R. 23–24). ALJ Loewy concluded that Ms. Clarke's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects

---

[8] ALJ Loewy deemed not severe Ms. Clarke's hypertension, which is controlled with medication, and her diagnosis of diabetes mellitus, which was well controlled without medication. (R. 22).

[9] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" (R. 24).

In assessing Ms. Clarke's RFC, ALJ Loewy noted that her hidradenitis suppurativa required a two-week hospitalization in 2016, partially due to anemic complications requiring a blood transfusion, and noted that Ms. Clarke is treated with iron supplements for her anemia. (R. 25). ALJ Loewy referenced Ms. Clarke's past inability "[d]ue to her hidradentis suppuritiva [sic.]" to cook, clean, do laundry and shop, or independently bathe or groom herself, but emphasized that in 2018 Ms. Clarke stated she was "okay" and did not require assistance in walking, eating, dressing, bathing or using the toilet. (R. 25). ALJ Loewy also documented Ms. Clarke's failure to receive follow up medical care at Montefiore Dermatology Clinic for her hidradenitis suppurativa or at Montefiore's GI Clinic for her anemia. (Id.)

ALJ Loewy assigned little weight to the opinion of NP Acker that Ms. Clarke was unable to work "because it is conclusory, does not provide a function-by-function assessment of [Ms. Clarke's] capabilities, and is not supported by the objective medical evidence." (R. 26). The Decision also notes two instances in which Ms. Acker's opinion appeared to be contradicted by underlying treatment notes. (R. 26). At this stage ALJ Loewy also considered the opinions of consulting examiners Cheryl Archbald, M.D., Ruby Phillips, Ph.D., and an agency consultant. (R. 26–27).

In sum, ALJ Loewy determined that Ms. Clarke's hidradenitis suppurativa, anemia, osteoarthritis, and degenerative disc disease supported limiting her to light work with postural limitations, and her anemic symptomology of fainting supported environmental limitations. (R. 27).

At step four, ALJ Loewy found that Ms. Clarke had no past relevant work. (R. 27). Finally, at step five, ALJ Loewy found that there were jobs in the national economy that she could perform, considering her age, education, work experience and residual functional capacity, including as a mail clerk, office helper, and photocopy operator. (R. 27–28).

### 3. The Appeals Council decision

On January 13, 2020, the SSA Appeals Council denied Ms. Clarke's request for review of ALJ Loewy's decision. (R. 1–5).

### III. DISCUSSION

#### A. Applicable Legal Standards

#### 1. Standard of Review

Under Rule 12(c), a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law. See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error. See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). Judicial review, therefore, involves two levels of inquiry. First, the Court must decide whether the ALJ applied the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). Second, the Court must decide whether the ALJ's decision was supported by substantial evidence. Id. "In

determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999). The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel. See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources. 20 C.F.R. §§ 404.1512(b), 416.912(b). Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007). When there are inconsistencies, gaps, or ambiguities in

the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. §§ 404.1520b, 416.920b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the Court will remand the case for further development of the evidence or for more specific findings.  Rosa, 168 F.3d at 82–83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

## 2.    Standards for benefit eligibility

For purposes of SSI benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be "of

such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(3)(B). In reviewing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, an alleged disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 416.920(a)(4)(i)–(v). The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof. At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy

that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In

meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-

Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid."

Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

### 3.    Assessing claimant's subjective allegations

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ

must first determine "whether there is an underlying medically determinable physical or mental

impairment(s) —i.e., an impairment(s) that can be shown by medically acceptable clinical and

laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's

pain or other symptoms." 20 C.F.R. § 416.929(c).  If such an impairment is found, the ALJ must

next evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's functional limitations."   20 C.F.R. §

416.929(c)(1).  To the extent that the claimant's expressed symptoms are not substantiated by

the objective medical evidence, the ALJ must evaluate the claimant's credibility.  See Meadors v.

Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d

Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two

parts."  Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010).

"First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of

the alleged symptoms (as opposed to the question in the first step of whether objective evidence

establishes a condition that could 'reasonably be expected' to produce such symptoms)."  Id.

"Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged

symptoms by reference to the seven factors listed [in 20 C.F.R. § 416.929(c)(3)]." Id. (citing Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). If the ALJ does not follow these steps, remand is appropriate. Id. at *15.

When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects. SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017). These seven factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See Bush, 94 F.3d at 46 n.4.

**B. Evaluation of the ALJ's Decision**

The ALJ evaluated Ms. Clarke's claim pursuant to the five-step sequential evaluation process and concluded that she was not disabled within the meaning of the Act as of her alleged onset date. (R. 28). The Court finds that ALJ Loewy failed to properly evaluate the medical evidence concerning Ms. Clarke's hidradenitis suppurativa at step three and respectfully recommends that remanding for further proceedings is warranted.

1. **Step Three Listed Impairment: Hidradenitis Suppurativa**

     a. **Legal standard under the Listings**

Listing § 8.00 sets forth the framework for evaluating the severity of skin disorders generally as well as specific skin disorders. See Listing § 8.00, 20 C.F.R. Pt. 404, Subpt. P, Appx 1. Listing § 8.06 requires a showing of "Hidradenitis suppurativa, with extensive skin lesions involving both axillae, both inguinal areas[10] or the perineum[11] that persist for at least [three] months despite continuing treatment as prescribed." Listing § 8.06. There is a temporal requirement that treatment must last for at least three months and extensive skin lesions must persist for at least three months in order to meet the requirement of a skin disorder listing. Listing § 8.00(H)(1). "Extensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation." Listing § 8.00(C)(1). The Listings set forth examples of extensive skin lesions that result in a very serious limitation, which "include, but are not limited to:"

   a) Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.
   b) Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.
   c) Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

Listing § 8.00(C)(1) (emphasis added). The Listings also provide that the SSA may consider the frequency of flareups of the skin disorder in its disability determination:

     [I]f you have frequent flareups, we may find that your impairment(s) is medically
     equal to one of these listings even though you have some periods during which

---

[10] Relating to the groin. Stedman's Medical Dictionary (Nov. 2014 ed.).
[11] The external surface between the vulva and the anus or the scrotum and the anus. Stedman's Medical Dictionary (Nov. 2014 ed.).

your condition is in remission. We will consider how frequent and serious your flareups are, how quickly they resolve, and how you function between flareups to determine whether you have been unable to do any gainful activity for a continuous period of at least 12 months or can be expected to be unable to do any gainful activity for a continuous of at least 12 months. We will also consider the frequency of your flareups when we determine whether you have a severe impairment and when we need to assess your residual functional capacity.

Listing § 8.00(C)(2). Symptoms, including pain, "may be important factors contributing to the severity" of skin disorders, and in making a disability determination, the ALJ must "assess the effects of medication, therapy, surgery, and any other form of treatment you receive" in determining the severity and duration of the impairment. Listing § 8.00(C)(3)–(4). Because treatment may be temporary, except in limited inapplicable circumstances (for genetic photosensitivity disorders and burns), a claimant must follow continuing treatment for at least three months before an impairment may meet the requirements of a skin disorder listing. Listing § 8.00(C)(4)(b).

### b. **Parties' arguments**

Ms. Clarke argues that ALJ Loewy's determination that her impairment did not meet Listing § 8.06 was conclusory and incongruous with the medical evidence. (ECF No. 22 at 18–23). Remand is required, Ms. Clarke argues, because the ALJ's decision "parroted the language of the listing" without analysis, and "did not adequately address which criterion of the listing was not satisfied." (Id. at 19, 22). Ms. Clarke sets forth her treatment history, particularly with her primary care provider, NP Acker, and for surgery, which, she argues, demonstrates extensive hidradenitis suppurativa, including lesions to her armpits (axillae), groin (inguinal area), under her breasts, and to her perineum, which she notes are "within all of the areas specified in [Listing § 8.06]" (ECF No. 22 at 20–21). Ms. Clarke highlights the debilitating nature and effects of her

condition, which has led to documented "persistent sinus tachycardia most likely related to infection and multiple painful wounds" and limited her ability to perform the activities of her daily life, including to ambulate, leading to the prescription and her use of, a cane to ambulate. (Id. (citing R. 365, 381–82, 437–38)).

The Commissioner acknowledges that the ALJ's Decision "may not have been as specific as [Ms. Clarke] would prefer" but maintains that substantial evidence elsewhere in the ALJ's decision supported the ALJ's finding that Listing § 8.06 was not met.  (ECF No. 24 at 20).  The Commissioner argues that Ms. Clarke's hidradenitis suppurativa lesions were not "extensive" under Listing § 8.00(C)(1) because:

> [T]he record only documents one instance of perineum lesions, during her May 2016 hospital stay, and while the record documents several instances of lesions in the inguinal area, it does not specify that there were lesions on both sides as required by the Listing.

(ECF No. 24 at 21) (internal citations omitted).  The Commissioner contends that Ms. Clarke's condition fails to establish the requirements of the Listing because her skin lesions did not exist for the requisite three-month period and because her ability to ambulate was not "very seriously limit[ed]" as evidenced by numerous instances during which she either reported that she had the ability to perform her usual activities or did not use her cane.  (ECF No. 24 at 21–23 (citing Listing § 8.00(C)(1)(c))).  Last, the Commissioner argued that the ALJ properly considered Ms. Clarke's failure to follow up with the Montefiore Dermatology Clinic for her hidradenitis suppurativa.  (Id. at 24).

### c.  Step three standard

In cases where a disability claim is premised upon a listed impairment, the ALJ should set forth a clear rationale in support of the decision to find or not to find a listed impairment.  Berry

v. Schweiker, 675 F. 2d 464, 468–69 (2d Cir. 1982) (per curiam) (affirming denial of benefits where portions of the ALJ's decision indicate his conclusion was supported by substantial evidence). An ALJ's failure to include a specific rationale for rejecting a Listing at step three may require remand if the determination was not supported by substantial evidence, "especially where credibility determinations and inference drawing is required of the ALJ." Id. at 469; see Salmini v. Commissioner, 371 F. Appx. 109, 112 (2d Cir. 2010) (finding that although decision did not detail why plaintiff's cardiac condition failed to meet a listing, it was supported by substantial evidence including plaintiff's testimony that he engaged in "a broad range of activities on a daily or occasional basis").

Thus, an ALJ's reliance on "boilerplate language that provides no meaningful explanation for his conclusion that plaintiff did not meet [specified Listing]" requires remand where the ALJ's detailed analysis at other steps "does not shed light on his conclusion at step three." Ryan v. Astrue, 5 F. Supp. 3d 493, 508 (S.D.N.Y. 2014); accord Twyne ex rel. Johnson v. Barnhart, No. 01 Civ. 2264 (LMM), 2003 WL 22299198, at *10 (S.D.N.Y. Oct. 7, 2003) (remanding where ALJ's minimal consideration of whether impairments were equivalent to any Listings—in just a single paragraph—prevented the court from determining whether the ALJ's conclusions were supported by substantial evidence); cf. Calzada v. Astrue, 753 F. Supp. 2d 250, 276 (S.D.N.Y. 2010) (adopting report and recommendation finding legal error at step three where the ALJ "did not even make mention of the list, much less discuss his conclusion regarding the severity of plaintiff's impairments in relation to the listed disabilities.")

An ALJ's failure to explain a finding of ineligibility based on the Listings is "troubling" where "claimant's symptoms as described by medical evidence appear to match those described

in the Listings" yet the ALJ rejects the Listing.  Booker v. Heckler, No. 83 Civ. 5300 (RLC), 1984 WL 622, at *3 (S.D.N.Y. Jul. 19, 1984) (granting plaintiff's motion for remand); see Knoll v. Berryhill, No. 18-cv-1912 (RAR), 2020 WL 1149994, at *3–5 (D. Conn. Mar. 10, 2020) (holding that ALJ's inadequate analysis at step three required remand, and declining to reach the merits of plaintiff's other arguments).  Where an ALJ evaluating a hidradenitis suppurativa claim fails to address whether plaintiff met the "extensive skin lesions" criterion of Listing § 8.06, the reviewing court "may not independently supply the missing analysis" and remand is required.  Barham v. Berryhill, No. CIV-18-151-G, 2019 WL 1421760, at *3–4 (W.D. Okla. Mar. 29, 2019).

### d.  Evaluation of the Decision

The ALJ's passing rejection of Listing § 8.06, unaccompanied by any analysis, was not supported by substantial evidence and requires remand.  ALJ Loewy's Decision disposed of Listing § 8.06 in a single sentence:  "Listing 8.06 is not met by the claimant's hidradenitis suppurativa because there is no evidence of extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least [three] months despite continuing treatment as prescribed."  (ECF No. 18 at 26).  This is inadequate.

ALJ Loewy did not explain her decision that Listing § 8.06 was not satisfied, and based on the Court's review of Ms. Clarke's medical records—which include ample evidence of serious and persisting hidradenitis suppurativa lesions and treatment far exceeding three months—her symptoms "appear to match those" described in the Listing.  Booker, 1984 WL 622, at *3. Accordingly, the Court cannot determine that ALJ Loewy's Decision was supported by substantial evidence.  See Twyne, No. 2003 WL 22299198, at *10; Barham, No. 2019 WL 1421760 at *3–4.

Briefly, as detailed supra, at II.B.2, the record includes continuous treatment by NPs Acker and Okpaleke with medication and notes chronic episodes of lesions including to the regions listed in Listing § 8.06: the bilateral axilla, groin and perineum. (See R. 352, 367, 369, 374, 381, 461–63, 468, 554, 557, 559–60, 562); Listing § 8.06. Ms. Clarke reports a decades-long history of experiencing episodes of hidradenitis suppurativa, and treatment records corroborate medical treatment from February 2015 though 2018. (See R. 355, 357, 365, 15). On the basis of this treatment, NP Acker opined that Ms. Clarke was unable to work for at least a year based in part on her Hurley Stage III hidradenitis suppurativa. (R. 351, 353). Indeed, Ms. Clarke's condition exhibited itself during the hearing before ALJ Loewy. (R. 57). The record also indicates instances where Ms. Clarke was in pain, her ability to ambulate was limited, and she required a cane to ambulate. (R. 562, 576–77).

In sum, the record indicates that Ms. Clarke's hidradenitis suppurativa manifested in painful and recurring lesions to the regions listed in Listing § 8.06 and resulted in functional limitations—and requiring a cane to ambulate. The record also includes the opinions of NP Acker, who treated Ms. Clarke consistently, that the condition prevented her from working, and Dr. Stampp, that her condition following surgery posed a risk of infection to Ms. Clarke and her cohabitants. (R. 351, 353, 392). This fulsome background stands in contrast to cases in which courts have found hidradenitis suppurativa to not limit a claimant's ability to work. See, e.g., House v. Commissioner, 32 F. Supp. 3d 138, 147 (N.D.N.Y. 2012) (ALJ's finding that hidradenitis suppurativa was not a severe impairment was not error where "no [medical] provider identified any impact on Plaintiff's ability to perform basic work activities[]" and plaintiff continued to work on a part-time basis); Hunt v. Colvin, No. 12-cv-888C, 2014 WL 585302, at *6–7 (W.D.N.Y. Feb.

13, 2014) (finding plaintiff not disabled where her hidradenitis suppurativa is not mentioned in medical records from plaintiff's treating physicians, there is no mention of its severity or limiting effects in the consulting examiner's assessment and plaintiff was able to engage in a variety of activities of daily life); Gay v. Colvin, No. 3:16-cv-01693 (WWE), 2018 WL 940545, at *2 (D. Conn. Feb. 16, 2018) (finding lesions did not cause a very serious limitation where plaintiff worked out daily, attended computer classes, and physical examinations with her treating physician were "essentially normal with no limitations noted").

Accordingly, "there is enough evidence in the record to support [Ms. Clarke's] contention that [s]he met the various elements of the listing that [the Court] cannot be assured that the ALJ, after making a reasoned consideration of those elements, would have found that [Ms. Clarke] did not meet the listing." Perozzi v. Berryhill, 287 F. Supp. 3d 471, 482, 484 (S.D.N.Y. 2018) (ALJ's decision that rejected the listing with "no analysis whatsoever" required remand where the reviewing court determined the claimant may have met the elements of the listing).

In Perozzi, the court held that even though the record included contradictory findings which could have led to a finding that the Listing was not met, "this possibility does not relieve the ALJ of his obligation to discuss the potential applicability of [specified Listing] or at the very least, to provide plaintiff with an explanation of his reasoning as to why plaintiff's impairments did not meet any of the listings." 287 F. Supp. 3d at 485–86 (citing Norman v. Astrue, 912 F. Supp. 2d 33, 81 (S.D.N.Y. 2012)).  Thus, the parties' disagreements about the regularity of Ms. Clarke's use of the cane to ambulate, and about whether she could perform her activities of daily life, underscore the ALJ's failure to meaningfully analyze the Listing at step three.  (See ECF Nos. 24 at 22–23; 27 at 5–6).

The Commissioner also argues that Ms. Clarke's lesions do not count as "extensive" because there was only one documented instance of perineum lesions and the record does not specify that there were "lesions on both sides" of the inguinal area. (ECF No. 24 at 21). Factually, this argument is incorrect, as the Post Operative Review dated May 3, 2016 indicated that Ms. Clarke had "extensive I and D [irrigation and drainage] of hidradenitis at multiple body locations . . . [including the] labia major b/l [bilateral][.]" (R. 465). The Commissioner's argument also fails to account for lesions to "both axillae" under Listing § 8.06, and is contrary to the open-ended nature of Listing § 8.00(C)(1), which provides "examples" of three types of "very serious limitations." This argument, like the ALJ's Decision, also not acknowledge that skin lesions may "medically equal" a listing if there are frequent flareups, and symptoms, including pain, may be "important factors" contributing to the severity of a claimant's skin condition. Listing § 8.00(C)(2)–(3).

*          *          *

The Court also notes that the ALJ did not ask Ms. Clarke how often she experiences episodes of hidradenitis suppurativa, or how long her lesions persist before healing. The ALJ also did not ask Ms. Clarke to describe her treatment or inquire how the outbreaks of hidradenitis suppurativa limit her, especially as an anemic. Nor did she seek elaboration on Ms. Clarke's quality of life when the hidradenitis suppurativa is in remission. These shortcomings are evident in the Decision. The Decision's analysis of Ms. Clarke's hidradenitis suppurativa at step three was, at best, conclusory and lacking in analysis. The Court respectfully recommends that remand is warranted.

On remand, "the ALJ should assess whether [Ms. Clarke] meets Listing [§ 8.06]. If the ALJ chooses to reaffirm [her] prior conclusion, [s]he should provide a 'clearer explanation' for [her] decision." Perozzi, 287 F. Supp. 3d at 486 (quoting Berry, 675 F.2d at 469).

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend granting Ms. Clarke's Motion (ECF No. 22); denying the Commissioner's Motion (ECF No. 24); vacating the Commissioner's decision denying benefits and remanding this matter to the agency for further proceedings.

The Clerk of Court is respectfully directed to close the motions at ECF Nos. 22 and 24.

Dated:      New York, New York
            May 26, 2021

_____
SARAH L. CAVE
United States Magistrate Judge

\*                          \*                          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Schofield.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).